# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES MUNSON,<br>#N95249,<br><br>    Plaintiff,<br><br>vs.<br><br>DR. L. OVERALL,<br>DR. HENDERSON,<br>DR. NEWBOLD,<br>WEXFORD HEALTH SOURCES, INC.,<br>and DR. LITHERLAND,<br><br>    Defendants. | Case No. 17–cv–1277–DRH |

## MEMORANDUM AND ORDER

**HERNDON, District Judge:**

Plaintiff James Munson, an inmate in Lawrence Correctional Center, brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights that allegedly occurred at Menard Correctional Center ("Menard") and Lawrence Correctional Center ("Lawrence"). In his Complaint, Plaintiff claims the defendants have been deliberately indifferent to his serious medical issues in violation of the Eighth Amendment. (Doc. 1). This case is now before the Court for a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A, which provides:

> (a) **Screening** – The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or

1

officer or employee of a governmental entity.
     (b) **Grounds for Dismissal** – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–
          (1) is frivolous, malicious, or fails to state a claim on which relief may be granted; or
          (2) seeks monetary relief from a defendant who is immune from such relief.

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that any reasonable person would find meritless. *Lee v. Clinton,* 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id*. at 557. At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

Upon careful review of the Complaint and any supporting exhibits, the Court finds it appropriate to allow this case to proceed past the threshold stage.

## The Complaint

In his Complaint (Doc. 1), Plaintiff makes the following allegations: these allegations span from "on or around November of 2010" and cover "continual ongoing matter[s]." (Doc. 1, p. 7). While Plaintiff was in segregation in Menard, he saw Dr. Overall for various dental matters, including for a tooth that had become sensitive due to Plaintiff's need for dentures. *Id.* Dr. Overall told Plaintiff

that his tooth had become sensitive because he needed a new partial plate because his was "worn down." *Id.* Dr. Overall then put a desensitizing gel on the tooth and had Plaintiff fitted for a new partial plate/dentures. *Id.* Plaintiff saw Dr. Overall at least two more times. *Id.* On July 23, 2012, at his two-year exam, Plaintiff asked Dr. Overall for oral gel or whatever she had put on his tooth before. *Id.* Dr. Overall then told Plaintiff that they "don't do that anymore" because "it cost too much and we was told to tell you all you have to buy sensodyne from commissary." *Id.*

When Plaintiff asked Dr. Overall about the partial plate/denture he was fitted for, Dr. Overall told Plaintiff that Wexford would not pay for it. *Id.* Plaintiff later discovered that in May of 2011, his "partial plate/denture form was destroyed per Dr. Overall's order or per orders of someone higher up, the Medical Director or by orders of Wexford." *Id.* Wexford has a "policy, practice, and financial incentive to save money at the expense of inmates [*sic*] well-being and constitutional rights by no longer providing a sensitive gel and not paying for needed dentures" even after "their employee has said that [Plaintiff needs them]" and had him fitted for them. *Id.*

Around January 2014, Plaintiff broke or chipped his tooth on his right upper side. *Id.* Plaintiff wrote request slips to Dental Health Care to see the dentist for months because he was in "such pain." *Id.* Plaintiff even asked around for pain pills. *Id.* It is the policy and practice of Wexford, carried out by its dentist employees, "to have inmates wait weeks or even months before they are

3

seen by a dentist or given treatment after many requests [have] been made." *Id.* Around April 22, 2014, the pain was so unbearable that the lieutenant had Plaintiff walked over to the Health Care Unit. *Id.* Plaintiff saw Dr. Henderson and informed him of his painful situation, which included pain from the tooth next to his broken tooth, which was also paining him, and a sensitive tooth on his left side. *Id.* Plaintiff requested something for his tooth to protect it, such as desensitizing gel. *Id.* Plaintiff also told Dr. Henderson that he needed another partial plate/denture because it was painful to eat with the one he had, and it was worn down, causing his tooth to be sensitive according to Dr. Overall. (Doc 1, p. 8).

Plaintiff reluctantly agreed to let Dr. Henderson pull his tooth because Dr. Henderson told Plaintiff he did not think it could be saved. *Id.* Plaintiff felt differently "because the tooth was only a little chipped/broken." *Id.* Dr. Henderson told Plaintiff that though the tooth on his left side is sensitive, he could not give him anything for it because "it cost too much." *Id.* He told Plaintiff that he should instead buy sensitive toothpaste from the commissary. *Id.* Plaintiff told Dr. Henderson that he does buy that toothpaste when he is able but that it does not really help. *Id.* Dr. Henderson then offered to extract Plaintiff's sensitive tooth, noting that it was still good. *Id.* Plaintiff refused the offer and requested that Henderson put gel on it instead because the tooth was "sensitive to hot, cold, water, and air." *Id.* Dr. Henderson denied the request. *Id.*

Plaintiff also asked Dr. Henderson about the partial plate he was fitted for.

4

*Id.* Dr. Henderson told him that he would not be getting it because he did not need it, and he needed "to have (3) three teeth missing before [he could] get a plate." *Id.* Plaintiff tried to explain that he needed one because his current situation was causing him pain, but Dr. Henderson did not change his answer. *Id.* Plaintiff then asked Dr. Henderson if he would see why the tooth on Plaintiff's right side was causing him pain. *Id.* Dr. Henderson told him that it needed to be filled or extracted, and when Plaintiff asked him to fix it, Henderson replied: "No! Put another request slip in and if it's still giving you problems I'll call you back over to look at it then." *Id.* Plaintiff asked him why he could not fix it then, and when Dr. Henderson offered to extract it, Plaintiff turned him down. *Id.* Dr. Henderson also "did do some filing down on the other tooth that needed fixing" and put Plaintiff down to have his other tooth fixed for a $5.00 co-pay. *Id.*

On or around May 25, 2014, a letter was written to Dr. Henderson explaining the dental problems and pain Plaintiff was experiencing from his other tooth for which he was expecting to be called for treatment. *Id.* The pain in the tooth Dr. Henderson refused to fix worsened. *Id.* Plaintiff's equilibrium was off, he was having bouts of dizziness, he could not eat on the right side of his mouth, he lost weight, and he suffered from severe headaches. *Id.* Plaintiff's headaches and pain were so bad that he had his right eye closed most of the time "because the tooth pain would shoot up the right side of [his] face giving [him] stern headaches." *Id.* Plaintiff was also still in pain because he was not given desensitizing gel on the left side of his jaw. *Id.*

From when he saw Dr. Henderson around April 22, 2014 to around July 18, 2014, Plaintiff was not called to the Health Care Unit by Dr. Henderson. *Id.* He was in a lot of pain and continued to self-medicate and buy pain pills from other inmates. *Id.* Plaintiff put in two or three requests to see dental per week during this time. *Id.* Plaintiff wrote to Dr. Henderson asking to see him, and he wrote Dental Director Dr. Newbold about the matter. *Id.* He did not receive a reply. *Id.*

On or around August 15, 2014, Plaintiff saw Dr. Henderson for tooth problems because he was due for a two-year exam. *Id.* Dr. Henderson was aware of Plaintiff's ongoing extreme pain, and when Plaintiff asked him for oral gel to stop the pain in his sensitive tooth, Dr. Henderson told him that he would need to buy sensodyne from commissary because he could not give Plaintiff anything to put on it. (Doc. 1, p. 10). When Plaintiff told him that he did not have money for the toothpaste, Dr. Henderson told him that he would have to deal with the pain. *Id.*

Plaintiff then inquired about the partial plate/denture for which he was fitted. *Id.* Dr. Henderson told him that he could not have another plate made, and that Plaintiff was there to see if he needed a filling or extraction only. *Id.* Plaintiff then told Dr. Henderson that he had another tooth missing, putting him at three, which should qualify him for a new plate under what Dr. Henderson told him during his last appointment. *Id.* Dr. Henderson reiterated that Plaintiff was only there for a filling or extraction, and that he could accept that treatment or

leave. *Id.*

Plaintiff told Dr. Henderson to treat his tooth. *Id.* At 9:27am, once Dr. Henderson numbed Plaintiff, a Dental Assistant (Sherry Jones) told Plaintiff he had a legal call at 10:00am. *Id.* Plaintiff asked Dr. Henderson if he would be done by 10:00am, but he did not reply. *Id.* Jones told Plaintiff that if he wanted to go to his legal call, he could be rescheduled. *Id.* When Plaintiff asked Dr. Henderson to reschedule because of his legal call, Dr. Henderson replied: "No! Sign a refusal." *Id.* Plaintiff told him that he wanted the treatment, he just wanted to reschedule it due to his legal call. *Id.* Dr. Henderson told him that he would not call Plaintiff back, and if he left, he would be refusing treatment. *Id.* Jones told Plaintiff to go on his legal call, and she would make sure he was rescheduled. *Id.* Plaintiff then asked Dr. Henderson for pain pills, but Dr. Henderson refused to provide him with any. *Id.*

On or around September 7, 2014, Plaintiff wrote another letter to Dr. Henderson begging him for treatment. (Doc. 1, p. 11). Around September 22, 2014, Plaintiff wrote Medical Director Dr. Newbold explaining his situation and asking him for treatment. *Id.* As of October 15, 2014, Plaintiff had not received a reply from either doctor or the dental office. *Id.* Plaintiff was self-medicating for months, in severe pain. *Id.* He could not eat on the right side of his jaw, and he could barely eat on the left side due to his sensitive tooth. *Id.* The pain caused him severe headaches, causing him to keep his right eye closed most of the time. *Id.* Plaintiff lost about 25-30 pounds because he could not eat properly and his

partial/plate denture was causing him pain. *Id.*

On or around February 6, 2015, the tooth on Plaintiff's right side was "treated/filled." *Id.* Plaintiff waited from April 22, 2014 to February 6, 2015 for this treatment. *Id.* Plaintiff still did not receive a partial plate/denture or treatment for his sensitive tooth on the left side of his jaw. *Id.* Between May and August 2016, "a letter was personally given to Dr. Newbold and [Plaintiff] was seen by him." *Id.* The letter explained Plaintiff's pain situation, addressing his sensitive tooth, his need for dentures, his bleeding and swollen gums from eating, and his need for a new partial plate. *Id.*

In September 2016, Plaintiff was seen by Dr. Newbold and explained his situation again. *Id.* Dr. Newbold told Plaintiff that he could not have a partial plate/denture put in if his tooth is painful. *Id.* He also told Plaintiff that his tooth looked good. *Id.* Plaintiff then asked for desensitizing gel or some other procedure that would numb the pain so the tooth could be saved since it was still good. *Id.* Dr. Newbold told Plaintiff that Wexford would not allow him to provide the tooth gel, and would not allow him to give Plaintiff any procedure other than extracting the tooth because other procedures would cost too much. *Id.* Newbold told Plaintiff that he would give him awhile to think about what he wanted to do. *Id.* Dr. Newbold had the authority to refer Plaintiff to an oral surgeon but did not, nor did he give Plaintiff sensitive gel or another appropriate procedure. *Id.*

On or around November 15, 2016, Plaintiff sent another letter to Dr. Newbold, which was also personally placed into Dr. Newbold's hands on

November 22, 2016. *Id.* The letter reminded Dr. Newbold that he told Plaintiff to write him about his dentures and sensitive tooth. *Id.* Plaintiff wrote another letter on or around December 5, 2016, which he hand delivered to Dr. Newbold's office. *Id.* Around January 3, 2017, Plaintiff wrote an emergency grievance about the dentures and tooth. *Id.* Plaintiff wrote five letters begging Wexford to instruct Dr. Henderson and Dr. Newbold to give Plaintiff proper dental treatment to relieve him of pain. *Id.*

On or around January 24, 2017, Plaintiff received a reply from Wexford, which told him to follow the sick call and grievance procedure to have his medical needs met. *Id.* It also stated that "they have qualified professionals to assist with [Plaintiff's] medical needs." *Id.* Around January 31, 2017, Plaintiff once again wrote Wexford informing it that he had written Dr. Henderson and Dr. Newbold many letters in order to get proper treatment, to no avail. *Id.* He further noted that he also wrote to Lisa Madigan, informing her that he was in constant pain and was not receiving proper dental treatment. *Id.* Plaintiff did not receive a reply to the second letter he sent to Wexford. *Id.*

Plaintiff wrote Lisa Madigan, the Attorney General, four letters on in October, November, and December 2016 and January 2017 explaining to her that he was denied proper dental treatment by Wexford, IDOC, and Menard medical staff, and that he was in constant pain. *Id.* In May of June, Plaintiff received a letter dated December 23, 2016 from Jeffrey Hutchinson, Warden of Menard, concerning the letter he sent to Madigan. (Doc. 1, pp. 12-13).

9

On February 15, 2017, Plaintiff was transferred from Menard to Lawrence. *Id.* Plaintiff saw Dr. Litherland around March 6, 2017. (Doc. 1, p. 13). Plaintiff informed Dr. Litherland of his sensitive tooth, that he was told he needed new dentures, that he had bleeding and swollen gums at times, that it hurt to chew his food, that chewing certain foods cut his gums, making them bleed, that he could not brush or floss his tooth, and that his inability to chew properly was causing him digestive problems. *Id.* Plaintiff requested sensitivity gel to prevent the tooth from hurting. *Id.* Dr. Litherland examined the tooth and noted that it was sensitive but told Plaintiff that they do not provide sensitivity gel. *Id.* He also told Plaintiff he would need to buy sensodyne from commissary. *Id.*

Plaintiff told Dr. Litherland that he had written a grievance about his dental issues in order to get treatment. *Id.* Dr. Litherland responded that he could not do anything for Plaintiff because he wrote a grievance, and that he would not do anything until he read the grievance. *Id.* He denied Plaintiff's requests for pain medication. *Id.* Plaintiff later put in a request to see Dr. Litherland. (Doc. 1, p. 14). When Plaintiff met with him, they discussed Plaintiff's sensitive tooth and dentures. *Id.* Dr. Litherland told Plaintiff that the only was he could get dentures would be to have the sensitive tooth extracted. *Id.* Plaintiff once again asked for sensitive gel for the tooth, since it would last 6 to 12 months. *Id.* Dr. Litherland told Plaintiff that they would not provide the gel. *Id.* Plaintiff then asked if he could perform a procedure to take the nerves from the tooth, or refer Plaintiff to an oral surgeon to see if the tooth could be saved. *Id.* Dr. Litherland laughed and

told Plaintiff that Wexford would not pay for that kind of procedure. *Id.* He went on to note that it would "be cheaper and better for [Plaintiff] to get it pulled and [he would] get [his] dentures." *Id.*

Plaintiff agreed to let Dr. Litherland pull his sensitive tooth on his advice because he was not going to get the gel or a procedure to fix it. *Id.* Plaintiff also signed a paper under duress because Dr. Litherland told Plaintiff that if he did not sign the paper, he could not get the tooth fixed. *Id.* Around August of 2017, Plaintiff saw Dr. Litherland and was fitted for dentures. *Id.* Plaintiff told him that he was having problems chewing his food and with his gums being cut, swollen, and sore, and that he was having digestive problems because he could not chew his food properly. *Id.* Dr. Litherland told Plaintiff to gargle with salt water and chew his food the best he could to avoid digestive problems. *Id.*

Around October 10, 2017, Plaintiff received his dentures. *Id.* He soon noticed once he returned to his cell that a tooth was missing, so he put in a request to see the dentist. *Id.* Around October 16, 2017, Plaintiff went to the Health Care Unit to see Dr. Litherland. *Id.* He told him about the missing tooth, and Dr. Litherland had him re-fitted for another partial plate/denture. *Id.* He told Plaintiff that it might not fit when it came back. *Id.*

"Wexford Health Sources Inc. [has a] policy and practice [under which] inmates must have (3) three teeth missing [in order] to receive dentures." (Doc. 1, p. 15). This "caused [Plaintiff] to suffer in pain for years." *Id.*

Plaintiff requests preliminary injunctive relief as well as monetary damages

11

from the defendants. (Doc. 1, p. 19).

## Discussion

Based on the allegations of the Complaint, the Court finds it convenient to divide the *pro se* action into 2 counts. The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. The designation of these counts does not constitute an opinion regarding their merit.

> **Count 1 –** Defendants showed deliberate indifference to Plaintiff's serious dental needs and pain associated therewith in violation of the Eighth Amendment.
>
> **Count 2 –** Dr. Litherland retaliated against Plaintiff for filing grievances by refusing Plaintiff requested treatment when Plaintiff told him he had filed grievances, in violation of the First Amendment.

As discussed in more detail below, Counts 1 and 2 will be allowed to proceed past threshold. Any other intended claim that has not been recognized by the Court is considered dismissed without prejudice as inadequately pleaded under the *Twombly* pleading standard.

## Count 1 – Medical Needs

A prisoner raising a claim against a prison official for deliberate indifference to the prisoner's serious medical needs must satisfy two requirements. The first requirement compels the prisoner to satisfy an objective standard: "[T]he deprivation alleged must be, objectively, 'sufficiently serious[.]'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The Seventh Circuit considers the following to be indications of

a serious medical need: (1) where failure to treat the condition could "result in further significant injury or the unnecessary and wanton infliction of pain;" (2) "[e]xistence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment;" (3) "presence of a medical condition that significantly affects an individual's daily activities;" or (4) "the existence of chronic and substantial pain." *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997).

The second requirement involves a subjective standard: "[A] prison official must have a 'sufficiently culpable state of mind,'" one that amounts to "'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson*, 501 U.S. at 297). Liability under the deliberate-indifference standard requires more than negligence, gross negligence or even recklessness; rather, it is satisfied only by conduct that approaches intentional wrongdoing, *i.e.*, "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Plaintiff has described a condition, continuing pain in his teeth, mouth, and stomach resulting from tooth sensitivity, a worn partial plate, and an inability to thoroughly chew food, that meets the "chronic and substantial pain" criteria of *Gutierrez*. Plaintiff's allegations therefore suffice to meet the objective showing that Plaintiff had a serious medical condition. Plaintiff also alleges that each of the named individual defendants, Dr. Overall, Dr. Henderson, Dr. Newbold, and Dr. Litherland, deliberately deprived him of pain medication for his sensitive tooth, a new partial plate, and various tooth repairs, and because of this, his

suffering continued and he ultimately had teeth removed that may have otherwise been salvageable.

Plaintiff blames this denial of medical care on Wexford. The Seventh Circuit has held that the *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (citing *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782 (7th Cir. 2014) (noting every circuit court that has addressed the issue has extended the *Monell* standard to private corporations acting under color of state law). In order to prevail on this claim against Wexford, Plaintiff must establish that its policies, customs, or practices caused a constitutional violation. *Whiting*, 839 F.3d at 664 (citing *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009)). Plaintiff alleges that Wexford instituted several policies, customs, or practices that resulted in his denial of proper care, including its policy of requiring an inmate to have three teeth missing before providing a partial plate/dentures, its policy of extracting teeth instead of treating them, and its policy of refusing to provide inmates with desensitizing gel. Further, Plaintiff asserts that each of these policies is a part of Wexford's practice of favoring cost savings over proper care.

Based on the foregoing, at this early stage, Count 1 shall proceed against each of the defendants.

### Count 2 – Retaliation

Prison officials may not retaliate against inmates for filing grievances or

otherwise complaining about their conditions of confinement. *See, e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002); *DeWalt v. Carter*, 224 F.3d 607 (7th Cir. 2000). To state a claim of retaliation "[a]ll that need be specified is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002).

Plaintiff asserts that Dr. Litherland retaliated against him for filing a grievance regarding the lack of medical attention he was getting for his dental problems. At issue here is whether Plaintiff experienced an adverse action that would likely deter First Amendment activity in the future, and if the First Amendment activity was "at least a motivating factor" in Litherland's decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009). This is a question that cannot be resolved at the pleadings stage of this case. Thus, Plaintiff may proceed on his retaliation claim against Dr. Litherland at this time.

### Severance

In *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007), the Seventh Circuit explained that a prisoner may not "dodge" the fee payment or three strikes provisions in the Prison Litigation Reform Act by filing unrelated claims against different defendants in one lawsuit. Rather, district courts must sever unrelated claims against different defendants or sets of defendants and require that the claims be brought in separate lawsuits. *Id.* In reaching this decision, the Appellate

15

Court reminded district courts that FED. R. CIV. P. 20 (governing joinder of *parties*) and FED. R. CIV. P. 18 (governing joinder of *claims*) apply as much to prisoner cases as they do to any other case. Thus, when a prisoner files a multi-claim, multi-defendant suit, courts must consider whether the parties and claims are properly joined under these rules.

In the instant case, with respect to Plaintiff's claims against Wexford, Overall, Henderson, Newbold, and Litherland, joinder of the parties and claims appears to be appropriate under Rules 20 and 18 despite the fact that Plaintiff's claims span over two prisons. However, if the Court subsequently determines that a claim against any of these parties has been misjoined, such claim may be severed at any time. FED. R. CIV. P. 21. Moreover, the Court has "broad power under Rule 21 to sever *even properly-joined claims* and [has] equally broad power under Rule 42(b) to keep the claims together for pretrial but then separate them for trial." Committee Comments, Rule 18 (emphasis added). Thus, as the case progresses, the Court remains open to reconsidering the issue *sua sponte* or on motion.

### Pending Motions

Plaintiff has filed a Motion for Preliminary Injunction, Motion for Protective Order (Doc. 2) in which he requests that the Court order the defendants to "preserve discoverable evidence in the form of dental x-rays of Plaintiff." (Doc. 2, p. 1). Because this Motion delves into discovery matters, it is **REFERRED** to a United States Magistrate Judge for a decision. Because the Motion was

terminated when this case was originally dismissed, the **CLERK** is **DIRECTED** to reinstate it as pending in CM-ECF.

Plaintiff has filed a Motion for Appointment of Counsel (Doc. 3) in this case. This Motion is **REFERRED** to a United States Magistrate Judge for a decision. Because the Motion was terminated when this case was originally dismissed, the **CLERK** is **DIRECTED** to reinstate it as pending in CM-ECF.

Plaintiff has filed a Motion for Service of Process at Government Expense (Doc. 4), which is hereby **GRANTED**. Service on the defendants shall be ordered below.

Plaintiff has filed a Motion to Alter or Amend Judgment (Doc. 11), which is **DENIED** as moot. The Order Dismissing Case (Doc. 8) and Judgment (Doc. 9) were vacated on January 29, 2018. (Doc. 10).

### Disposition

**IT IS HEREBY ORDERED** that **COUNT 1** shall **PROCEED** against **OVERALL**, **HENDERSON**, **NEWBOLD**, **LITHERLAND**, and **WEXFORD HEALTH SOURCES, INC.**

**IT IS FURTHER ORDERED** that **COUNT 2** shall **PROCEED** against **LITHERLAND**.

**IT IS FURTHER ORDERED** that as to **COUNTS 1** and **2**, the Clerk of Court shall prepare for **OVERALL**, **HENDERSON**, **NEWBOLD**, **LITHERLAND**, and **WEXFORD HEALTH SOURCES, INC.**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of

Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to the defendants' place of employment as identified by Plaintiff. If one of the defendants fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require the defendant pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

With respect to a defendant who no longer can be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, the defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to a United States Magistrate Judge for further pre-trial proceedings. Further, this entire matter shall be **REFERRED** to a United States Magistrate Judge for disposition, pursuant to Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *if all parties consent to*

*such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs, despite the fact that his application to proceed *in forma pauperis* has been granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

Judge Herndon
2018.02.01
10:30:42 -06'00'

_____
**U.S. District Judge**