IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JAMES MUNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:17-CV-1277-MAB |
| | ) | |
| STEVEN NEWBOLD and | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 109) filed by Defendants Steven Newbold, M.D. ("Dr. Newbold") and Wexford Health Sources, Inc. ("Wexford"). For the reasons set forth below, the Court will grant the motion and this action will be dismissed with prejudice.

### PROCEDURAL BACKGROUND

This action stems from dental treatment given to Plaintiff James Munson by Defendants while Munson was an inmate incarcerated at Menard Correctional Center, a facility operated by the Illinois Department of Corrections ("IDOC").

Munson filed this action in November 2017 pursuant to 42 U.S.C. § 1983 (Doc. 1). Upon screening by this Court, Munson was allowed to proceed on two counts: (1) that Wexford and Doctors Overall, Henderson, Newbold, and Litherland were deliberately indifferent to his serious dental needs and pain in violation of the Eighth Amendment, and (2) that Dr. Litherland retaliated against Munson for the filing of grievances in

violation of the First Amendment (Doc. 1; Doc. 12). Defendants moved for summary judgment on the basis of administrative exhaustion in August 2018 (Docs. 58, 62), and it was granted as to Doctors Overall, Henderson, and Litherland, leaving Munson proceeding solely on the basis of Count 1 against Wexford and Dr. Newbold (Docs. 86, 93).

Dr. Newbold and Wexford then filed the instant motion for summary judgment on the merits of Munson's claim on December 12, 2019 (Doc. 109). At the behest of the Court, Defendants filed an additional exhibit that contained a typed transcription of the handwritten portions of the dental records and an explanation of any abbreviations/shorthand used in the dental records (Doc. 117; *see also* Doc. 115). Munson filed a response in opposition to the motion for summary judgment on April 8, 2020 (Doc. 120),[1] and Dr. Newbold and Wexford replied on May 19, 2020 (Docs. 127, 128).

## FACTUAL BACKGROUND

Munson has been incarcerated since 1991 and was housed at Menard between 2003 and 2017. Wexford has a contract with IDOC to provide dental and medical services to inmates at IDOC facilities, including Menard.

On November 15, 2010, Munson saw Dr. Lilian Overall, a dentist employed by Wexford, at Menard (Doc. 110-2, pp. 1–2; Doc. 110-3, pp. 3–4; Doc. 117, pp. 1–2). Munson complained of sensitivity in his upper left tooth #13 and upper right tooth number #3 from cold air, and Dr. Overall applied Duraflor to the teeth. Duraflor is a fluoride varnish

---

[1] An unsealed, redacted version of Munson's response is at Doc. 137.

use to treat dental hypersensitivity (Doc. 110-2, p. 2). Applying a desensitizing gel or fluoride varnish to a sensitive tooth or teeth is generally not a permanent cure for dental sensitivity. It only provides temporary relief and is considered palliative treatment.

Munson testified that Dr. Overall told him the sensitivity was likely caused by his partial dentures, which he indicated were made at Pontiac Correctional Center in 1995 (Doc. 110-1, pp. 13–15, 28). He further testified that Dr. Overall had him fitted for dentures but then later told him that Wexford would not pay for new dentures. Munson's dental records, however, do not provide any indication that he was fitted for new dentures (Doc. 110-2, p. 2; *see* Doc. 110-3).

On November 22, 2010, dental x-rays were taken of Munson's teeth (Doc. 110-2, p. 2; Doc. 110-3, p. 4; Doc. 117, p. 2). Dr. Overall noted that Munson requested partial dentures, that he had existing partial dentures (made in "1995"), and she added Munson to the "O3x1" list for impressions/dentures/partial.

Munson was not seen again until May 2011, when he reported to the clinic to request partial dentures again (Doc. 110-2, p. 2; Doc. 110-3 at p. 4; Doc. 117, p. 2). However, Munson's co-payment form was destroyed, which the Court presumes to mean that Munson was not seen. Dr. Overall informed him that he was on the "AOL O3" list for impressions/dentures/partials.

On April 5, 2012, Dr. Harry Henderson saw Munson for his "evaluation for impressions/dentures/partials and noted that Munson was not a candidate for partial dentures at that time as he had adequate occlusion (Doc. 110-2, p. 3; Doc. 110-3, p. 4; Doc. 117, p. 2).

In July 2012, Munson was seen by Dr. Overall again for his biannual dental exam (Doc. 110-2, p. 3; Doc. 110-3, p. 4). Dr. Overall noted that Munson requested sensitivity treatment on his molars, and she explained to him that the requested treatment was no longer available. Dr. Overall recommended that Munson purchase Sensodyne toothpaste, which was available in the Menard commissary. Sensodyne is a sensitivity toothpaste which offers patients relief from tooth sensitivity with twice daily brushing (Doc. 110-2, p. 3). Munson testified that he purchased Sensodyne toothpaste when he could afford it (Doc. 110-1, 17).

Munson was not seen again until April 2014, when he was seen as a walk-in by Dr. Harry Henderson regarding a broken tooth (Doc. 110-2, pp. 3–4; Doc. 110-3, p. 4; Doc. 117, p. 2). Dr. Henderson noted that tooth #4 had fractured enamel and deep decay into the pulpal portion of the tooth. Tooth #3 also had fractured enamel, decay, and a failed restoration. Dr. Henderson discussed treatment benefits, alternatives, risks, and consequences of no treatment with Munson. After Dr. Henderson explained to Munson that he did not qualify for partial dentures because he was not missing two side-by-side teeth, Munson consented to extraction of tooth #4, and the tooth was extracted that day. Dr. Henderson noted to schedule Munson for evaluation of tooth #3 if Munson wrote for treatment. Munson testified that he also requested treatment for tooth sensitivity from Dr. Henderson and was again advised to buy Sensodyne (Doc. 110-1, p. 20). Munson further recalled that he was told by Dr. Henderson he needed to have three teeth missing before he could be provided with partial dentures. Indeed, IDOC Administrative Directive 04.03.102 (as amended in January 2012) provides that if a posterior tooth

(meaning a tooth in the rear; a molar or a pre-molar, not the front teeth or canine teeth) is extracted during incarceration, a prosthetic may be fabricated but is not mandated unless three or more of the missing teeth are required for mastication (Doc. 110-4, p. 3).

Munson was scheduled to be seen for his bi-annual exam on July 14, 2014, but it had to be rescheduled due to a lockdown (Doc. 110-2, p. 4; Doc. 110-3, p. 10). It was also noted that Munson should be scheduled for treatment of tooth #3.

Munson indicated that on July 15, 2014, he wrote a letter to Dr. Steven Newbold,[2] the chief dentist at Menard, complaining that he was in pain and still needed treatment for tooth #3 but Dr. Henderson was not responding to his letters or scheduling him for the treatment (Doc. 1-2, pp. 45–47, 52–54, 56–57; Doc. 110-1, pp. 20–21, 22, 26). Munson states that he placed the letter "in the cell bars" and a shift officer picked it up. For his part, Dr. Newbold does not recall receiving this letter, and he did not make a note in Munson's dental chart that a letter was received, which was his custom and practice (Doc. 110-2, pp. 4-6; *see* Doc. 110-3). Munson was unable to definitely say whether Dr. Newbold received the letter (Doc. 110-1, p. 21).

Munson was scheduled to be seen for his bi-annual exam and for treatment of tooth #3 on July 21st and again on July 28th, but both appointments had to be rescheduled due to a lockdown (Doc. 110-2, p. 4; Doc. 110-3, p. 10). Munson was finally able to have his appointment with Dr. Henderson on August 5th (Doc. 110-2, p. 5; Doc. 110-3, pp. 7,

---

[2] Dr. Newbold was employed by Wexford as the Chief Dentist at Menard Correctional Center from March 1, 2012 to March 31, 2018 (Doc. 110-2, p. 1).

10). Dr. Henderson noted Munson's teeth were class IIIA and IIIB, which means there are medium to large non-painful carious lesions (class IIIA) and localized gingival involvement (class IIIB). Dr. Henderson examined tooth #3 and discussed treatment benefits, alternatives, risks, and consequences of no treatment with Munson. Munson signed a consent form for Dr. Henderson to evaluate and treat tooth #3 as needed. Dr. Henderson prepped Munson for treatment of tooth #3 and numbed his mouth but then Munson left before treatment started in order to take a legal call. Munson testified that he again raised the issue of partial dentures with Dr. Henderson but was told that the current visit was only for extractions or fillings (Doc. 110-1, p. 21).

Munson indicated he wrote a letter to Dr. Newbold on September 20, 2014, complaining about his need for treatment for tooth #3 (Doc. 1-2, pp. 45–47, 52–54, 56–57; Doc. 110-1, pp. 20–21, 22, 26). Munson states that he placed the letter "in the cell bars" and a shift officer picked it up. Once again, Dr. Newbold does not recall receiving this letter, and he did not make a note in Munson's dental chart that a letter was received, which was his custom and practice (Doc. 110-2, pp. 4-6; *see* Doc. 110-3). Munson was unable to definitely say whether Dr. Newbold received the letter (Doc. 110-1, p. 22).

On February 6, 2015, Munson saw Dr. Henderson for his follow-up appointment for treatment of tooth #3 (Doc. 110-2, p. 5; Doc. 110-3, pp. 8, 10; Doc. 117, p. 3). Dr. Henderson removed the failing restoration and decay from the tooth and then filled it. He noted that the tooth should be extracted if problems persisted. Dr. Henderson also noted that Munson should be scheduled to have tooth #4 added to his partial denture.

Munson testified that at this appointment he requested desensitizing gel or Sensodyne but was not given any (Doc. 110-1, p. 25).

Munson indicated that he wrote a letter to Dr. Newbold on May 25, 2016, complaining about his sensitive tooth #13 and need for partial dentures (Doc. 1-2, pp. 45–47, 52–54, 56–57; Doc. 110-1, pp. 20–21, 22, 26). Munson states that he personally handed this letter to Dr. Newbold, although he could not recall when; he testified that it was sometime between May and August of 2016. Once again, Dr. Newbold does not recall receiving this letter, and he did not make a note in Munson's dental chart that a letter was received, which was his custom and practice (Doc. 110-2, pp. 4-6; *see* Doc. 110-3).

Nevertheless, Munson was scheduled for an evaluation for partial dentures on August 25, 2016 (*see* Doc. 110-3, p. 10), although there is no indication how that appointment actually came to be. That appointment was the first time Dr. Newbold saw Munson (Doc. 110-2, p. 6; Doc. 110-3, p. 10; Doc. 117, p. 3). Dr. Newbold evaluated Munson's teeth and noted that he had existing partial dentures but was missing tooth #4 and that he complained of sensitivity to tooth #13, which had gingival recession, which is another way of saying a receding gumline. Dr. Newbold ordered panoral x-rays to evaluate the condition of Munson's teeth. He also noted that Munson gave him a letter at this appointment, but Dr. Newbold explained that he likely did not send a written response because he knew that he would be seeing Munson for a follow-up appointment and would speak with him in person then.

The x-rays were taken on September 9th (Doc. 110-3, p. 10). Dr. Newbold reviewed the x-rays and directed that a follow-up appointment should be scheduled. That

appointment occurred on September 19th (Doc. 110-2, pp. 6–7; Doc. 110-3, p. 12). Munson once again complained of pain in tooth #13. Dr. Newbold informed Munson that he could not give him new partial dentures if it would cause him pain. When a missing tooth is filled by partial dentures, the dentures need to latch or hook onto the tooth adjacent to the missing tooth. Because Munson was missing tooth #14, the partial dentures would need to latch onto tooth #13. But Munson complained of sensitivity to tooth #13. Therefore, Dr. Newbold did not refer Munson for partial dentures because the dentures would need to latch onto his painful and sensitive tooth #13. Munson told Dr. Newbold that he was reluctant to have tooth #13 removed and wanted to think about it. Dr. Newbold prescribed Munson Ibuprofen 400mg tablets to take three times a day for ten days as needed for pain. Munson was instructed to write when he wanted treatment. Munson testified that Dr. Newbold told him that he would be called back to have tooth #13 extracted when he wrote and requested it (Doc. 110-1, p. 27). The September 2016 appointment was Dr. Newbold's last appointment with Munson (Doc. 110-2, p. 7).

According to Dr. Newbold, Munson did not write for any treatment for tooth #13 or make any other requests for treatment until he was transferred out of Menard (Doc. 110-2, p. 7). However, Munson testified that he sent two letters to Dr. Newbold around November or December 2016, but he did not recall whether or not he received any response (Doc. 110-1, p. 29; *see also* Doc. 1-2, pp. 58–62). Letters attached to the complaint include a letter to Dr. Newbold dated November 15, 2016, in which Munson asked for "some kind of protection" to place on the sensitive tooth (Doc. 1-2, pp. 59–60). It is clear he was *not* asking for the tooth to be extracted (*see id.*). There is another letter to Dr.

Newbold dated December 5, 2016 in which Munson mentions a gel that used to be put on his sensitive tooth and asks Dr. Newbold to "call [him] over" (*Id.* at pp. 61–62).

A note in the dental chart indicates that Dr. Newbold responded to a letter on December 22, 2016 (*Id.*; Doc. 110-2, pp. 7–8; Doc. 110-3, p. 12). This response appears to be part of a letter from the warden at Menard to Munson dated December 23, 2016, which indicated that Dr. Newbold had reviewed Munson's dental records and the letters that he had sent to the Attorney General's Office (Doc. 1-1, p. 66). It further indicated that the sensitivity gel he wanted was not currently available and the tooth had to be removed prior to the fabrication of a new partial denture but Munson was reluctant to agree to the removal. Another note in the dental chart indicated that Dr. Newbold responded to a grievance on February 2, 2017 (Doc. 110-2, p. 7; Doc. 110-3, p. 12; *see also* Doc. 1-2, pp. 1–14; Doc. 59-3, p. 4). There is no evidence as to what this response was (*see* Docs. 110, 137, 127).

By that time, Munson had been approved for a transfer to a medium security facility (Doc. 59-3, p. 4). And on February 15, 2017, Munson was transferred from Menard to Lawrence Correctional Center ("Lawrence") (Doc. 110-2, p. 8). Dr. Mark Litherland saw Munson on February 24th and examined his teeth (*Id.*; Doc. 110-3, p. 12). Dr. Litherland noted that Munson reported that tooth #13 had caused problems for several years. Upon examination, Dr. Litherland noted that tooth #13 had extreme root exposure, low lesion to the distal side of the tooth root and was symptomatic. He said the tooth had questionable prognosis for monitoring the tooth and recommended extraction.

Dr. Litherland saw Munson again on March 6, 2017 (Doc. 110-2, pp. 8–9; Doc. 110-3, p. 12). He noted that the dental x-rays showed tooth #13 had extreme bone loss, had questionable prognosis due to its sensitivity, and was a poor long-term abutment tooth to support partial dentures. Due to these circumstances, Dr. Litherland advised extracting tooth #13 and providing partial dentures to replace all missing teeth.

Prior to this appointment, Munson filed a grievance on February 25, 2017, noting the grievance filed in January at Menard and again requesting proper dental treatment (Doc. 1-2, pp. 8-9; Doc. 59-2, pp. 1–4). The grievance was not received or responded to before Munson's next appointment with Dr. Litherland on March 6th (*see* Doc. 59-2, pp. 1, 4; Doc. 110-2, p. 9; Doc. 110-3, p. 12). The prison's response to the grievance indicated that tooth extraction and partial dentures were part of Munson's dental plan and that the extraction was scheduled (Doc. 59-2, pp. 1, 4).

On March 20, 2017, Dr. Litherland saw Munson for a consultation and advised him of the plan to extract tooth #13 but noted that Munson was very apprehensive about the extraction (Doc. 110-2, p. 9; Doc. 110-3, p. 14). Seven days later, Dr. Litherland saw Munson and again recommended the extraction of tooth #13 (Doc. 110-2, pp. 9–10; Doc. 110-3, pp. 14, 17, 18). Although Munson was apprehensive about the extraction, he signed the consent form and tooth #13 was removed. Dr. Litherland told Munson that the area had to heal for three to four months and then he would be evaluated for new partial dentures.

In August 2017, Dr. Litherland submitted a request for partial dentures, which was approved (Doc. 110-2, pp. 10–11; Doc. 110-3, p. 14). Partial denture impressions were

taken on August 18th and Munson received his new partial denture on October 10, 2017. At a follow-up appointment four days later, Munson complained that he was missing a tooth in his dentures. Litherland noted that his partial dentures were indeed missing a tooth and that there might not be sufficient space for that tooth. Dr. Litherland took the partial and noted that he would evaluate it for possible installation of tooth #2. In November 2017, Munson was given altered partial dentures with acrylic added to fill the space of the missing tooth because, as Dr. Litherland noted, the space was insufficient to install a complete replacement tooth.

Munson has subsequently indicated that the altered dentures still fit poorly and cause him pain and that he cannot eat while wearing them (Doc. 110-1 at p. 33). He further claims that he verbally expressed these complaints to Litherland, who did not record them in his chart (*Id.* at p. 37).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232–24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

To succeed on a claim based on deliberate indifference in the context of medical services, an inmate must demonstrate (1) an objectively serious medical need and (2) that defendants had a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

A medical need may be deemed serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe*, 631 F.3d at 857 (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). A medical condition "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Roe*, 631 F.3d at 857 (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

To establish that prison medical staff acted with a subjectively culpable state of mind, an inmate need not show that harm was intended, but merely that "defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Roe*, 631 F.3d

at 857 (quoting *Greeno*, 414 F.3d at 653). Medical professionals are entitled to deference when acting in their professional capacities, and inmates face a heavy burden in bring claims of deliberate indifference against them. *Roe*, 631 F.3d at 857 "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). Merely negligent conduct will not rise to this level—rather, such conduct must reach a level "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821-822 (7th Cir. 2012) (citation omitted).

## Discussion

### A. Dr. Newbold

There appear to be three issues related to Munson's dental care: the failure to provide him with sensitivity gel for tooth #13, the delay in receiving treatment for tooth #3, and the delay in receiving partial dentures. Munson's argument boils down to an assertion that (1) all three issues constituted serious medical needs; (2) Dr. Newbold was aware of these needs from an early date; (3) but contrary to accepted medical judgment, Dr, Newbold took no action to remedy these needs, thereby exhibiting deliberate indifference. The Court is skeptical of Munson's argument and ultimately concludes that it is on the third point where he has most clearly fallen short.

With respect to the tooth sensitivity gel, Munson has provided little basis for the Court to conclude his sensitive tooth constituted a serious medical need or posed any serious risk to his health or well-being. Tooth sensitivity gel and related products such as Sensodyne are commonly sold over the counter as a treatment for mild tooth sensitivity. These products seem akin to other common household medicines used to self-treat minor ailments—while these products are intended to address cognizable medical complaints, it's not clear that the lack of these products rises to the level of being "so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653.

Furthermore, even if the Court assumes that Dr. Newbold knew that Munson wanted the tooth sensitivity gel, there is simply no evidence that he was deliberately indifferent to those requests. Munson was consistently told that Wexford no longer provided gel and he would need to purchase Sensodyne at his own expense. Dr. Newbold cannot possibly give Munson something he does not have. Moreover, instructing an inmate to purchase a medical product that is readily available through the prison commissary, and the inmate has provided no indication the purchase was unaffordable, does not constitute deliberate indifference. *Poole v. Isaacs,* 703 F.3d 1024, 1026 (7th Cir. 2012) (It is "now well established" that "the Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care.")

As for the repair of tooth #3, Dr. Henderson noted in April 2014 that Munson was supposed to write when he was ready for treatment. The evidence demonstrates that

Munson did not attempt to notify Dr. Newbold of any issue with getting tooth #3 repaired until he wrote him a letter on July 15, 2014. However, Dr. Newbold testified he did not recall receiving such a letter and there is no evidence from which it can be inferred that he did. Even if the Court assumes that Dr. Newbold did receive this letter, there is nothing from which a jury could find he responded with deliberate indifference. At the time Munson sent the letter, he was already scheduled to have tooth #3 treated but his appointment had to be postponed due to a lockdown at the prison. Dr. Newbold had no control over lockdowns. Munson was then seen on August 5th—which was only three weeks after he purportedly sent the letter to Dr. Newbold. Under these circumstances, no reasonable jury could conclude that Dr. Newbold was deliberately indifferent up to that point.

Then at the August 5th appointment, Dr. Henderson had Munson numbed up and was ready to fill tooth #3 but Munson left the appointment before the dentist could do so because he wanted to take a legal call. Munson claims he sent another letter to Dr. Newbold a month and a half later on September 20th asking for treatment for tooth #3. There is nothing that suggests at that point, Dr. Newbold played any part in the delay in treatment or even knew about the delay. Rather, the delay was of Munson's own making. Any delay after that also cannot be blamed on Dr. Newbold. He once again testified he did not recall receiving a letter from Munson on or around September 20th and Munson has no evidence from which it can be inferred that Dr. Newbold actually did receive the letter. Consequently, no reasonable jury could find Dr. Newbold was deliberately indifferent with respect to the treatment of Munson's tooth #3.

The final issue is Munson's request for partial dentures. Munson was told in April 2012 that he was not eligible for partial dentures paid for by the IDOC because he had adequate occlusion. Two years later, he had tooth #4 extracted. It appears at that point Munson was missing three posterior teeth, but Dr. Henderson told him that he was still not eligible for partial dentures because none of his missing teeth were side-by-side.[3] The first letter that Munson sent to Dr. Newbold that contained any mention of partial dentures was the one dated May 25, 2016. But Munson could not recall when he purportedly handed it to Dr. Newbold. For his part, Dr. Newbold testified that he does not recall receiving this letter and he did not make a note of receiving any letters in Munson's dental chart until he saw him for the first time on August 25, 2016 to evaluate him for partial dentures.

At the time Dr. Newbold saw Plaintiff on August 25th and September 19th, the state of Munson's teeth, specifically the decay of certain teeth that dentures would put pressure on, meant that certain extractions and other remedial dental work had to be performed before partial dentures could be fitted. The evidence indicates that Munson was reluctant to have that remedial work performed and never indicated to Dr. Newbold that he was willing to have tooth #13 extracted. Munson ultimately consented and in time received his partial dentures, although this occurred shortly after he had been transferred out of Menard, when he was no longer in Dr. Newbold's care. The Court does not dispute Munson's claim that there was a significant delay in having teeth added to his existing

---

[3] Whether this was correct is not an issue that is presently before the Court.

partial denture or receiving a new one. But for much of the delay, there is no evidence that it could be attributed to Dr. Newbold. Once Dr. Newbold came into the picture, he recommended a course of treatment that Munson disagreed with and was unwilling to consent to. In other words, the delay was once again of Munson's own making and cannot establish that Dr. Newbold was deliberately indifferent. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ."); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor . . . about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to establish deliberate indifference).

Accordingly, the Court must grant summary judgment to Newbold.

### B. Wexford

A private corporation acting under the color of state law, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). Under *Monell*, a plaintiff must show that his constitutional injury was caused by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (quoting *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir.2010)). A corporate action can take the form of an express policy adopted and promulgated by the corporation, an informal but

widespread and well-settled practice or custom, or a decision by an official of the corporation with final policymaking authority. *Glisson*, 849 F.3d at 379.

Here, Munson invokes the first and second theories and argues that his injuries were the byproduct of unlawful policies and widespread practices, including its policy of requiring an inmate to have three teeth missing before providing a partial plate/dentures, its policy of extracting teeth instead of treating them, and its policy of refusing to provide inmates with desensitizing gel (Doc. 12, p. 14). Munson further asserts that each of these policies is a part of Wexford's practice of favoring cost savings over proper care (Doc. 12, p. 14).

Munson's claim against Wexford depends on the individual liability of the practitioners. In instances like this, the corporation cannot be found liable if the individual employee is found not to have shown deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

The Court has determined that no reasonable jury could find that Dr. Newbold was deliberately indifferent. And he made no specific argument as to any of the other dentists (*see* Doc. 137). Consequently, the Court must enter summary judgment for Wexford as well.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** summary judgment to all Defendants and **DISMISSES** this action **with prejudice**.

IT IS SO ORDERED.

DATED: November 24, 2020

s/ Mark A. Beatty
MARK A. BEATTY
United States Magistrate Judge